UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BENITO CAMACHO,<br><br>                      Plaintiff,<br><br>        -against-<br><br>CAROLYN W. COLVIN, Acting Commissioner<br>of Social Security,<br><br>                  Defendant. | 15cv7080 (CM) (DF)<br><br>**REPORT AND<br>RECOMMENDATION** |

**TO THE HONORABLE COLLEEN MCMAHON, U.S.D.J.:**

In this action, *pro se* plaintiff Benito Camacho ("Plaintiff") seeks review of the final decision of defendant Carolyn W. Colvin, Acting Commissioner of Social Security ("Defendant" or the "Commissioner"), denying Plaintiff Supplemental Security Income ("SSI") benefits under the Social Security Act (the "Act") on the ground that, during the period when he was eligible for benefits, Plaintiff's impairments did not constitute a disability for purposes of the Act.  Currently before this Court for a report and recommendation are Defendant's motion, pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, for judgment on the pleadings affirming the Commissioner's decision (Dkt. 12), and Plaintiff's opposition to Defendant's motion (Dkt. 18), which, as discussed below, this Court construes as a cross-motion for judgment on the pleadings in his favor.

For the reasons set forth below, I respectfully recommend that Defendant's motion for judgment on the pleadings be denied, that Plaintiff's cross-motion for judgment on the pleadings be granted, and that the case be remanded for further proceedings.

# BACKGROUND[1]

Plaintiff filed an application for SSI on December 21, 2012 (R. at 168-74), alleging that he became disabled as of April 14, 2011,[2] as a result of a variety of physical impairments (*id.* at 207). Plaintiff's current challenge to the denial of his claim focuses on whether the ALJ properly determined that, despite these impairments, Plaintiff was capable of performing work existing in significant numbers in the national economy and, therefore, was not disabled for the purposes of the Act.

### A.   Plaintiff's Personal and Employment History

Plaintiff was born on January 2, 1980, and was 32 years old at the time he filed his application. (*See id.* at 168.) He lives alone in the Bronx, New York, and has two children, who were four and 10 years old at the time of Plaintiff's hearing on April 17, 2014. (*See id.* at 42, 44, 184.) Plaintiff maintains a relationship with a woman he has variously described as his

---

[1] The background facts set forth herein are taken from the Social Security Administration ("SSA") Administrative Record (Dkt. 11) (referred to herein as "R." or the "Record"), which includes, *inter alia*, Plaintiff's medical records and the transcript of an April 17, 2014 hearing held before Administrative Law Judge ("ALJ") Hilton Miller, at which Plaintiff and a vocational expert testified. As discussed below (*see* Discussion, *infra*, at Sections I(E), III(C)), the Record for this case not only includes evidence that was before the ALJ at the time he made his determination, but also certain evidence that Plaintiff submitted to the SSA Appeals Council, upon his administrative appeal.

[2] The Record contains inconsistent information regarding the date when Plaintiff allegedly became unable to work as the result of a claimed disability. In Plaintiff's SSI application, he stated that he became disabled as of September 1, 2007 (R. at 168), but, in his accompanying Disability Report, he stated that he stopped working on April 14, 2011 (*id.* at 207), and, in his testimony before the ALJ, he testified that he stopped working in December of 2012 (*id.* at 41). Despite these discrepancies in the Record, the parties now appear to agree that Plaintiff is claiming disability as of April 14, 2011, the date in the Disability Report. (*See id.* at 21 (ALJ's decision, analyzing Plaintiff's claim as one "alleging disability beginning April 14, 2011"); 259 (Plaintiff's letter to Appeals Council following ALJ's decision, stating the same).)

significant other, his spouse, or the "mother of [his] kids." (*See id.* at 41, 168, 184, 194, 206, 220.)

According to Plaintiff's earnings records and an "Activities of Daily Living" form that he filed with the SSA, Plaintiff was employed for a short time in 2000 and again in 2002 as a bar or restaurant worker. (*See id.* at 179, 195-96, 200.) According to those documents as well as Plaintiff's hearing testimony and Disability Reports, Plaintiff last worked full-time, as a bridge painter, from approximately 2006 to 2011. (*See id.* at 37-39, 179-80, 195, 197-99, 201.) Plaintiff testified before the ALJ that he then worked for an extermination company, until December of 2012. (*See id.* at 39-42; *see also* n.2, *supra* (noting inconsistent information in the Record regarding the onset date of Plaintiff's claimed disability).)

Plaintiff graduated from high school, and possesses a number of construction certifications related to his work as a bridge painter. (*See id.* at 37, 60, 208.)

### B.   Medical Evidence

The relevant medical evidence of record consists of treatment records and other information submitted by Plaintiff's treating sources, pharmacy prescription records, and a report of an examination conducted by a consulting internist. In his application for SSI, Plaintiff claimed to be disabled based on a combination of a number of physical conditions, including lower back pain, chronic pain syndrome, mild facet arthrosis,[3] lumbosacral spondylosis,[4] lumbar

---

[3] Facet joints are the joints connecting the vertebrae of the spine. *See* https://www.niams.nih.gov/Health_Info/Back_Pain/default.asp (last accessed Dec. 14, 2016). Arthrosis, also referred to as osteoarthritis or degenerative joint disease, occurs when cartilage is lost between the joints, which, over time, "can permanently damage the joint." https://medlineplus.gov/osteoarthritis.html (last accessed Dec. 15, 2016).

[4] Spondylosis "refers to the general degeneration of the spine associated with normal wear and tear that occurs in the joints, discs and bones of the spine." http://www.ninds.nih.gov/disorders/backpain/detail_backpain.htm (last accessed Dec. 15, 2016).

disc displacement, lumbosacral neuritis,[5] lumbago,[6] arthritis, asthma, and high cholesterol.  (*See id.* at 168-74, 207.)  At his hearing before the ALJ, Plaintiff also testified that he had partial hearing loss.  (*Id.* at 46-47.)  This Court will only summarize below the medical evidence relating to these various conditions.[7]

Although Plaintiff's disability allegedly began on April 14, 2011, the relevant period under review runs from December 21, 2012, the date that Plaintiff applied for SSI, through June 19, 2014, the date of the ALJ's decision.  *See Frye v. Astrue*, 485 F. App'x 484, 485 n.1 (2d Cir. 2012) (noting that, for purposes of an application for SSI benefits, a claimant must show that he was disabled between the time his application was filed and the time of the ALJ's decision).

     1.    **Treating Sources**

     a.    **Treatment at All Med**

Plaintiff received treatment from various professionals at All Med Medical and Rehabilitation Center ("All Med") in the Bronx, New York.  (*See id.* at 275-334.)

---

[5] Neuritis is "an inflammatory or degenerative lesion of a nerve marked especially by pain, sensory disturbances, and impaired or lost reflexes."  https://www.merriam-webster.com/dictionary/neuritis (last accessed Jan. 19, 2017).

[6] Lumbago is an alternative term for back pain.  *See* https://medlineplus.gov/backpain.html (last accessed Dec. 15, 2016).

[7] Although the medical evidence before the Court contains a few vague references to potential mental health issues (*see, e.g.*, Dkt. 18 at 9 (treatment notes of pain-management specialist, noting:  "Mental health counseling strongly encouraged")), these references appear immaterial here, as Plaintiff is not claiming disability as the result of any psychiatric condition; the Record does not reflect that he received any mental health evaluation or treatment; and, in his administrative hearing, he expressly denied that he had "any type of mental problems."  (*Id.* at 60.)

i.      **All Med Visits Pre-Dating the Relevant Period**
        **(Prior to December 21, 2012)**

The Record contains evidence regarding several appointments that Plaintiff had at All Med that pre-dated Plaintiff's application for benefits on December 21, 2012.  As this evidence provides background information relevant to Plaintiff's claim, it summarized here.

Plaintiff had two appointments at All Med with Richard J. Smaydo, D.O., on October 13 and October 29, 2008.  (*Id.* at 305-06.)  In treatment notes from Plaintiff's October 13 visit, Dr. Smaydo stated that Plaintiff had been diagnosed with asthma sometime during 2008.  (*Id.* at 306.)  Plaintiff complained of occasional shortness of breath and reported that he had been using an albuterol[8] inhaler with increased frequency.  (*Id.*)  Plaintiff also complained of right shoulder pain, but denied experiencing any acute shoulder injury.  (*Id.*)  On conducting a physical exam, Dr. Smaydo identified no abnormalities, except that Plaintiff experienced pain with abduction and extension of the arms.  (*See id.*)  Dr. Smaydo scheduled Plaintiff for blood tests, for pulmonary function testing, and for an X-ray of Plaintiff's shoulder.  (*Id.*)

At a follow-up appointment on October 29, Dr. Smaydo noted that the X-ray of Plaintiff's shoulder had revealed no abnormalities, but that pulmonary function testing had revealed a "moderately severe restriction."  (*Id.* at 305.)  Dr. Smaydo diagnosed Plaintiff with "[m]oderate persistent asthma," and prescribed Plaintiff albuterol, Advair, and Singulair[9] as

---

[8] Albuterol, also referred to in Plaintiff's medical records by the brand name Ventolin, is a medication used to treat difficulty breathing, shortness of breath, and other symptoms of lung diseases, including asthma.  *See* https://medlineplus.gov/druginfo/meds/a682145.html (last accessed Dec. 15, 2016).

[9] Advair, the brand name for a medicine containing fluticasone and salmeterol, is used to treat asthma symptoms "when a patient's asthma has not been controlled sufficiently on other asthma medicines."  https://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0010369/ (last accessed Dec. 15, 2016).  Singulair, the brand name for the medicine montelukast, is used to prevent

treatment.  (*Id.*)  Dr. Smaydo also noted that Plaintiff's blood tests were "significant for

hyperlipidemia," or high blood cholesterol levels.[10]  (*Id.* at 305.)  To address his hyperlipidemia,

Dr. Smaydo recommended that Plaintiff make lifestyle changes.  (*See id.*)

Plaintiff's next visits to All Med, on August 19 and October 17, 2011, are documented in

partially illegible treatment notes that do not indicate the name of the treating provider.  (*See id.*

at 282-83.)  At the August 19 appointment, Plaintiff complained of back pain and right elbow

pain.  (*Id.* at 283.)  On examination, the provider located subcutaneous nodules on one of

Plaintiff's arms.  (*Id.*)  The provider's assessment included lipomas,[11] asthma, and back

derangement.[12]  (*Id.*)  The provider re-prescribed albuterol and Advair for Plaintiff's asthma.

(*See id.*)  At the October 17 appointment, Plaintiff complained of constant back pain, and, on

examination, the provider identified lumbar para-spinal tenderness.  (*See id.* at 282.)  Plaintiff

was advised to follow up for pain management.  (*See id.*)  An associated report from blood tests

_____

asthma symptoms.  *See* https://medlineplus.gov/druginfo/meds/a600014.html (last accessed
Dec. 15, 2016).

[10] *See* https://medlineplus.gov/ency/article/000403.htm (last accessed Dec. 15, 2016).

[11] "A lipoma is a noncancerous growth of fatty tissue cells," which is generally harmless,
and is "most commonly found in the subcutaneous layer just below the skin."
https://medlineplus.gov/ency/imagepages/1209.htm (last accessed Dec. 15, 2016).  The presence
of lipomas or cysts on Plaintiff's body was noted during a number of Plaintiff's later
appointments at All Med (*see* R. at 275, 294, 303), and Plaintiff was reportedly scheduled for
surgical cyst removal in July of 2013 (*id.* at 291).  As Plaintiff did not allege, and does not now
contend, that his lipomas or cysts constituted severe impairments or caused him to experience
any symptoms, these notations are not summarized in further detail herein.

[12] Derangement is "a disturbance of normal bodily functioning or operation."
https://www.merriam-webster.com/medical/derangement (last accessed Dec. 21, 2016).

conducted that day shows that Plaintiff had elevated levels of albumin,[13] total cholesterol, and LDL cholesterol.  (*See id.* at 288.)

Plaintiff visited All Med again on April 13, 2012, when he was treated by internist Monica Martin, M.D.  (*Id.* at 303.)  Partially illegible treatment notes reflect that Plaintiff was found to have mild wheezing, and that Dr. Martin re-prescribed albuterol and Advair for Plaintiff's asthma.  (*See id.*)  On October 8, 2012, Plaintiff returned to see Dr. Martin.  (*See id.* at 278-81.)  At that time, Plaintiff denied experiencing hearing loss or ear pain, cough or shortness of breath, or nausea.  (*Id.* at 279.)  Plaintiff complained, however, of insomnia, back pain, and joint pain.  (*See id.*)  On physical examination, Plaintiff's ears were normal and his hearing grossly intact, and Plaintiff's respiratory effort and breathing were normal.  (*See id.* at 280.)  Plaintiff's lumbar spine was tender.  (*See id.*)  As Plaintiff was overweight, with a body mass index ("BMI") of 25.37 (*see id.* at 279), Dr. Martin recommended that Plaintiff exercise, "as tolerated," in order to reduce his BMI (*id.* at 281).  Dr. Martin prescribed Plaintiff a Ventolin inhaler.  (*Id.*)

### ii.      All Med Visits During the Relevant Period (December 21, 2012 to June 19, 2014)

On January 11, 2013, Plaintiff had an appointment with Dr. Martin at All Med, during which Dr. Martin reviewed with Plaintiff the abnormal results of a blood test taken at his prior appointment, on October 8, 2012.  (*See id.* at 275-77, 284-86.)  As Plaintiff could not recall whether he had fasted prior to having his blood drawn, Dr. Martin scheduled Plaintiff for re-testing.  (*See id.* at 276.)  Plaintiff again denied experiencing hearing loss or ear pain, cough or shortness of breath, or nausea (*id.*), but complained of fatigue (*id.* at 275).  Dr. Martin

---

[13] Elevated albumin levels may indicate the presence of kidney disease.  *See* https://medlineplus.gov/ency/article/003580.htm (last accessed Dec. 15, 2016).

re-prescribed Plaintiff Ventolin and Advair. (*Id.* at 276.) Dr. Martin also referred Plaintiff for a CT scan of the chest and abdomen. (*See id.*)

On April 4, 2013, Plaintiff met again with Dr. Martin, who noted that Plaintiff did not undergo the CT scan planned at his prior appointment. (*Id.* at 294.) Dr. Martin re-prescribed Plaintiff Ventolin, and prescribed Tricor[14] as well. (*Id.* at 295.) At Plaintiff's next visit to Dr. Martin, on April 26, 2013, Dr. Martin noted that recent blood work revealed abnormal blood cholesterol levels. (*See id.* at 291.) Dr. Martin re-prescribed Plaintiff albuterol, Advair, and Singulair for his asthma. (*Id.* at 292-93.) She also diagnosed Plaintiff with hypercholesterolemia, and prescribed Plaintiff simvastatin[15] as treatment. (*See id.* at 293.)

On August 1, 2013, Plaintiff returned to All Med for a re-fill of his medications, and was seen by internist Jose I. Rodriguez, M.D. (*Id.* at 315-17.) On September 26, 2013, Plaintiff complained of chest pain in a visit with Dr. Rodriguez, who referred Plaintiff to Michael Swirsky, M.D., of Healthcare Radiology, for X-rays of Plaintiff's chest and lumbar and thoracic spine. (*See id.* at 312-14, 332-34.) Dr. Swirsky's X-ray of Plaintiff's chest revealed "clear lungs" and "[n]o acute pathology." (*Id.* at 333.) Dr. Swirsky also identified "[n]o acute pathology" of Plaintiff's lumbar or thoracic spine, although Dr. Swirsky noted that, if Plaintiff's symptoms persisted, a follow-up CT or MRI scan might "be helpful." (*See id.* at 332, 334.)

---

[14] Tricor, also known by the generic name fenofibrate, is a medication used to reduce blood cholesterol and triglyceride levels. *See* https://medlineplus.gov/druginfo/meds/a601052.html (last accessed Dec. 15, 2016).

[15] Simvastatin, commonly known by the brand name Zocor, is used to decrease low-density lipoprotein ("LDL") cholesterol and triglycerides in the blood, and to increase high-density lipoprotein ("HDL") cholesterol in the blood. *See* https://medlineplus.gov/druginfo/meds/a692030.html (last accessed Dec. 15, 2016).

Dr. Rodriguez met with Plaintiff on October 24, 2013 to discuss those results.  (*Id.* at 308-310.)

Associated treatment notes are largely illegible.  (*See id.* at 311.)

On December 24, 2013, Plaintiff met with Dr. Rodriguez again, complaining of coughing

and wheezing.  (*Id.* at 307.)  Dr. Rodriguez diagnosed Plaintiff with an upper respiratory

infection, and prescribed Plaintiff Augmentin.[16]  (*Id.*)  Apart from these notations, treatment

notes from this visit are largely illegible.  (*See id.*)  On January 21, 2014, Plaintiff was seen by

Anthony Mandese, P.A. ("Mandese"), who noted, on physical examination of Plaintiff's chest,

rhonchi,[17] a "[c]lear to hard cough," and wheezing.  (*Id.* at 320.)  Mandese re-prescribed

Plaintiff Advair and Ventolin.  (*Id.*)

Also available in the Record, and submitted along with certain records from All Med, is a

letter dated March 11, 2014 and sent to Dr. Rodriguez by an unidentified individual at Binder &

Binder.[18]  (*See id.* at 318.)  The letter noted that the Binder & Binder firm was representing

Plaintiff in his benefits claim, and requested that Dr. Rodriguez provide the firm with Plaintiff's

medical records and also complete both a "narrative report" and a "multiple impairment

---

[16] Augmentin, the brand name for a medicine containing amoxicillin and clavulanate, is an antibiotic used to treat lung infections.  *See* https://medlineplus.gov/druginfo/meds/a685024.html (last accessed Dec. 15, 2016).

[17] Rhonchi are sounds resembling snoring, which "occur when air is blocked or air flow becomes rough through the large airways."  https://medlineplus.gov/ency/article/007535.htm (last accessed Dec. 15, 2016).

[18] On March 21, 2014, following the initial denial of Plaintiff's benefits claim, but prior to his hearing before the ALJ, Mario A. Davila, a non-attorney employed by Binder & Binder, assumed representation of Plaintiff in connection with that claim.  (R. at 98.)  An attorney with the firm, Bryce Kirschbaum, Esq., joined in that representation on April 15, 2014.  (*Id.* at 161-62.)  Binder & Binder then continued its representation of Plaintiff on his appeal of the ALJ's decision to the Appeals Council, when another attorney with the firm, Gary C. Pernice, Esq., submitted a letter to the Council on Plaintiff's behalf.  (*See id.* at 259-61.)  Plaintiff, however, is now proceeding *pro se* in this Court.

questionnaire." (*See id.*)  All Med's medical record department provided the firm with a copy of

Plaintiff's medical records, but did not respond regarding the requested report and questionnaire.

(*See id.* at 319.)

> **b.    Treatment by Fenar Themistocle, M.D.,
> Interborough Interventional Pain Management
> (August 25, 2011 to December 21, 2012)**

Plaintiff also received treatment from pain-management specialist Fenar

Themistocle, M.D., of Interborough Interventional Pain Management, although the only

associated treatment records that were before the ALJ pre-dated Plaintiff's application for

benefits on December 21, 2012.

On August 25, 2011, on the referral of Dr. Themistocle, Plaintiff underwent an MRI of

the right elbow and of the lumbar spine.  (*See id.* at 262-64.)  The Record does not contain any

treatment notes from Plaintiff's underlying visit with Dr. Themistocle, but does contain records

from Doshi Diagnostic Imaging Services, where Plaintiff's MRIs were performed.  (*See id.*)

Narayan Paruchuri, M.D., noted that Plaintiff's right elbow MRI was performed in connection

with Plaintiff's complaints of chronic elbow pain.  (*Id.* at 262.)  Based on the MRI, Dr. Paruchuri

concluded that Plaintiff suffered from tendinosis of the right triceps tendon, but without a

discrete tear.  (*See id.*)  Gregory Lawler, M.D. performed the lumbar spine MRI, in connection

with Plaintiff's complaints of lower back pain.  (*See id.* at 263-64.)  The MRI revealed mild facet

arthrosis and a bulging disc[19] between the L4 and L5 vertebrae, "resulting in mild central canal

---

[19] When the spongy disc located between two vertebrae is compressed, allowing the
disc's nucleus to bulge outward, it "is considered a bulging dis[c]."
http://www.hopkinsmedicine.org/healthlibrary/conditions/nervous_system_disorders/lumbar_dis
k_disease_herniated_disk_85,P00783/ (last accessed Dec. 15, 2016).  With continued age-related
degeneration or stress on the disc, the nucleus may rupture, or herniate, pressing on nearby nerve
roots and causing pain and other symptoms.  *See id.*

stenosis,"[20] as well as mild facet arthrosis and a bulging disc between the L5 vertebrae and the sacrum,[21] "without significant stenosis."  (*Id.* at 263.)  Dr. Lawler did not identify any focal disc herniation.  (*Id.* at 264.)

The only treatment notes of Dr. Themistocle that were before the ALJ were from a December 12, 2012 appointment.  (*Id.* at 267.)  These notes reference a prior visit by Plaintiff, on October 10, 2012, for which no treatment notes are available.  (*Id.*)  During the December 12 appointment, Plaintiff complained of lower back pain, radiating to the thigh, primarily on the left side.  (*Id.*)  Plaintiff indicated that his pain was an "8/10" without medications.  (*Id.*) Dr. Themistocle listed Plaintiff's existing diagnoses as chronic pain syndrome,[22] lumbosacral spondylosis, lumbar disc displacement, lumbosacral neuritis, and lumbago.  (*Id.* at 267-68.) Dr. Themistocle indicated that Plaintiff had, at an unspecified time, undergone a caudal epidural steroid injection, a lumbar medial branch block, and a transforaminal selective nerve block, [23]

---

[20] Spinal stenosis is a narrowing of the spine, which can put pressure on a patient's "nerves and spinal cord and can cause pain."  https://medlineplus.gov/spinalstenosis.html (last accessed Dec. 15, 2016).

[21] The 33 vertebrae of the backbone are "separated by spongy disks and classified into four distinct areas." http://www.hopkinsmedicine.org/healthlibrary/conditions/nervous_system_disorders/lumbar_disk_disease_herniated_disk_85,P00783/ (last accessed Dec. 15, 2016).  The lumbar spine "consists of five bony segments in the lower back area," and the sacrum is a single bone fused from five separate bones, located at the base of the backbone.  *See id.*

[22] Chronic pain syndrome, which is "poorly defined," is generally diagnosed where pain "lasts longer than six months," or "longer than it should," and may be caused by a "large variety" of physical conditions.  http://weillcornellpainmedicine.com/health-library/chronic-pain (last accessed Dec. 15, 2016).

[23] A medial branch block is a procedure in which local anesthetic, and sometimes a steroid, is injected near the nerve that supplies the medial branch joint, and is "typically ordered for patients who have pain primarily in their back coming from arthritic changes in the facet joints or for mechanical low back pain." http://www.brighamandwomens.org/Departments_and_Services/anesthesiology/Pain/Patients/blocks1.aspx?sub=2 (last accessed Dec. 15, 2016).  A transforaminal selective nerve block is also a

which resulted in "good improvement" in Plaintiff's back pain.  (*See id.* at 267.)

Dr. Themistocle re-prescribed Plaintiff's current medications, which included Neurontin, Elavil,

Flexeril, and oxycodone.[24]  (*Id.* at 267-68.)  Plaintiff reportedly experienced no side effects from

the medications, and had found them helpful "with activities of daily living."  (*Id.* at 267.)

Dr. Themistocle's notes state that Plaintiff had "been advised not to drive or operate machinery

while on [oxycodone]."  (*Id.* at 268.)

    During Plaintiff's December 12, 2012 appointment, on performing a physical exam,

Dr. Themistocle noted that Plaintiff's gait was antalgic.[25]  (*Id.* at 267.)  Dr. Themistocle also

noted that, on palpation, Plaintiff's paravertebral area and trapezius and sacrospinalis muscles

were spasmodic and tender.  (*Id.*)  Dr. Themistocle further noted that flexion, rotation, and

extension of Plaintiff's lower back was limited, and that lateral flexion and extension of his back

was painful.  (*Id.*)  A Patrick's test[26] of Plaintiff's lower back was positive on the left side.  (*Id.*)

---

type of injection used to diagnose and treat back pain.  *See*
www.paineducation.vcu.edu/documents/epiduralfacet.pdf (last accessed Dec. 15, 2016).

    [24] Neurontin, a brand name for gabapentin, is an anticonvulsant medication that may be
used "to prevent seizures and relieve pain for certain conditions in the nervous system."
http://www.mayoclinic.org/drugs-supplements/gabapentin-oral-route/description/drg-20064011
(last accessed Dec. 16, 2016).  Elavil, a brand name for amitriptyline, is an antidepressant
medication also used off-label to treat fibromyalgia and migraines.  *See*
http://www.consumerreports.org/cro/2012/05/off-label-drug-prescribing-what-does-it-mean-for-
you/index.htm (last accessed Dec. 16, 2016).  Flexeril, a brand name for cyclobenzaprine, is a
muscle relaxant used to relieve pain caused by muscle injuries.  *See*
https://medlineplus.gov/druginfo/meds/a682514.html (last accessed Dec. 16, 2016).  Oxycodone
is an opioid used to treat moderate to severe pain.  *See*
https://medlineplus.gov/druginfo/meds/a682132.html (last accessed Dec. 16, 2016).

    [25] An antalgic gait is "marked by . . . an unnatural movement assumed by someone to
minimize or alleviate pain or discomfort."  https://www.merriam-webster.com/medical/antalgic
(last accessed Dec. 16, 2016).

    [26] A Patrick's test (also known as a FABER, or flexion abduction external rotation test) is
a pain provocation test used to diagnose sacroiliac joint pain.  *See*
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1924656/ (last accessed Dec. 16, 2016).

As treatment, Dr. Themistocle advised that Plaintiff continue taking his prescribed medications and receive physical therapy; Dr. Themistocle also performed a left lumbar facet joint radiofrequency rhizotomy procedure[27] on Plaintiff.  (*See id.* at 268-69.)

### c.    Pharmacy Prescription Records (August 22, 2011 to January 31, 2014)

The Record also contains documents reflecting prescriptions that Plaintiff had filled at Mott Haven Pharmacy & Surgical Inc. and Crotona Pharmacy Corp., both located in the Bronx, New York, from August 22, 2011 to January 31, 2014.  (*See id.* at 251-52, 256-58.)  Notably, these documents reflect that Dr. Themistocle prescribed oxycodone (among other medications) to Plaintiff on 10 occasions between November 1, 2011 and January 14, 2013, although, as stated above, the Record includes no treatment notes for any associated appointments, other than for Plaintiff's appointment on December 12, 2012.  (*See id.* at 251-52.)  Additionally, Plaintiff was prescribed oxycodone on November 15, 2012 by another provider, identified only as Danny Fuzaylov.  (*Id.* at 252.)  Plaintiff was also prescribed oxycodone by Dr. Rodriguez, of All Med, on November 25, 2011; January 23, 2012; November 29, 2013; December 27, 2013; and January 29, 2014.  (*Id.* at 257-58.)

---

Sacroiliac joint pain is pain located where the sacrum, at the base of the spine, connects to the iliac bones, which are the two bones that comprise the pelvis.  *See* https://medlineplus.gov/ency/patientinstructions/000610.htm (last accessed Dec. 16, 2016).

[27] Radiofrequency rhizotomy is a procedure in which an electrode is used to damage nerves, which may temporarily alleviate pain.  *See* http://www.umanitoba.ca/cranial_nerves/trigeminal_neuralgia/manuscript/rhizotomies.html (last accessed Dec. 16, 2016).

2.      **Consultative Examination by**
        **SSA Physician Marilee Mescon, M.D.**
        **(February 5, 2013)**

On February 5, 2013, internist Marilee Mescon, M.D., conducted a consultative examination of Plaintiff for purposes of Plaintiff's SSA disability claim.  (*Id.* at 271-74.)  In reviewing Plaintiff's medical history, Dr. Mescon noted that Plaintiff reported having had back pain for the previous seven years, which had worsened after his involvement in three motor vehicle accidents.  (*Id.* at 271.)  Plaintiff described his pain as a "9/10," reduced to "5/10" with the use of medication, and stated that the pain increased when he bent forward.  (*Id.*)

Dr. Mescon noted that Plaintiff had undergone an MRI, which had shown a bulging disc between the L4 and L5 vertebrae, with mild stenosis and mild facet arthrosis.  (*Id.*)  Dr. Mescon also noted that Plaintiff reported having received 15 epidural back injections since 2011, but that Plaintiff had not undergone back surgery.  (*Id.*)  With respect to Plaintiff's asthma, Dr. Mescon's report is inconsistent, in that it states that Plaintiff "[had] been asthmatic since 2011," while also indicating that Plaintiff stated that his last visit to an emergency room for his asthma "occurred in 2009."  (*Id.*)  Further, Dr. Mescon stated that Plaintiff had reportedly "never been hospitalized for uncontrolled asthma," while elsewhere stating that Plaintiff was reportedly "hospitalized twice, once in 2009 and again 2011 at Lincoln Hospital[,] for asthma."  (*Id.* at 271-72.)  Plaintiff reported that stress, upper respiratory tract infections, and dust worsened his asthma symptoms. (*Id.*)  With respect to Plaintiff's hearing, Plaintiff apparently reported that a tumor had been removed from his ear in 1989, causing him to lose "30% of his hearing."  (*Id.* at 271.)

Dr. Mescon noted, though, that, during the examination, Plaintiff was "able to hear . . . normal voice tones."  (*Id.*)  Plaintiff reported that he was presently taking oxycodone, amitriptyline, gabapentin, Flexeril, and Advair to treat his conditions.  (*Id.* at 272.)

With respect to Plaintiff's lifestyle, Dr. Mescon noted that Plaintiff reportedly did not smoke, drink alcohol, or use illegal drugs, and that he lived alone.  (*Id.*)  Further, Plaintiff apparently told Dr. Mescon that he could cook, shower, bathe, and dress, but that he needed help to clean, do laundry, and shop.  (*Id.*)  Dr. Mescon noted that Plaintiff reported that he spent time listening to the radio, watching TV, and reading.  (*Id.*)

Dr. Mescon conducted a physical examination of Plaintiff, during which she noted that Plaintiff was 5'6" tall and weighed 159 pounds, and that his blood pressure was 102/84.  (*Id.*)  She observed that Plaintiff had a normal gait and did not appear to be in acute distress.  (*Id.*)  Dr. Mescon noted that Plaintiff could perform a full squat, had a normal stance, could walk on his heels and toes and rise from a chair without difficulty, did not use any assistive devices, and did not need assistance changing for the exam or getting on and off the exam table.  (*Id.*)  Dr. Mescon further noted that an examination of Plaintiff's skin, head, eyes, ears, nose and throat, chest and lungs, heart, and abdomen revealed each to be normal.  (*Id.*)  Dr. Mescon noted that Plaintiff had "shotty" bilateral posterior cervical lymph nodes.[28]  (*Id.*)

As to Plaintiff's musculoskeletal system, Dr. Mescon noted that Plaintiff's cervical and lumbar spine showed full flexion, extension, lateral flexion, and rotary movement bilaterally.  (*Id.*)  Dr. Mescon identified no abnormalities of the thoracic spine.  (*Id.*)  Plaintiff was able to raise his straightened legs to 30 degrees when supine, and to 90 degrees when seated, and was able to extend each hip 95 degrees.  (*Id.*)  Dr. Mescon observed that Plaintiff maintained full range of motion in his shoulders, elbows, forearms, wrists, knees, and ankles.  (*Id.*)  Dr. Mescon

---

[28] The posterior cervical lymph nodes are located on the back of the neck.  *See* https://meded.ucsd.edu/clinicalmed/head.htm (last accessed Dec. 16, 2016).  "Shotty" enlarged lymph nodes, which are small and hard (and thus "have a similar feel to buckshot"), are common.  http://stanfordmedicine25.stanford.edu/the25/lymph.html (last accessed Dec. 16, 2016).

noted no neurological abnormalities and stated that Plaintiff's strength was "5/5" in all

extremities.  (*Id.*)  Dr. Mescon also found that Plaintiff's hand and finger dexterity were intact,

and that Plaintiff's grip strength was "5/5" bilaterally.  (*Id.* at 274.)

Dr. Mescon diagnosed Plaintiff with chronic back pain and asthma, and stated that his

long-term prognosis was "fair."  (*Id.*)  Dr. Mescon concluded that, based on her examination,

there did not appear to be any limitations in Plaintiff's abilities to sit, stand, climb, push, pull, or

carry heavy objects.  (*Id.*)  Dr. Mescon concluded, however, that due to Plaintiff's history of

asthma, exposure to toxic dust, chemicals, or fumes was "not recommended."  (*Id.*)

**3.**     **Evidence Submitted to the Appeals Council**
**Subsequent to the ALJ's Hearing and Decision**

Following the ALJ's denial of his request for benefits on June 19, 2014, Plaintiff

submitted additional evidence to the Appeals Council, related to his treatment by pain

management specialist Dr. Themistocle.  (*See* R. at 335-36, 338-41, 343-48.)  This evidence

included certain medical records, dated August 20, 2014; two letters, each addressed to Plaintiff

himself and dated October 10, 2014; and a completed "Summary Impairment Questionnaire" and

"Spinal Impairment Questionnaire," dated June 23, 2014 and October 10, 2014, respectively.

The medical records indicate that Plaintiff received a transforaminal epidural steroid

injection on August 20, 2014 (*see id.* at 338-39), and the October 10, 2014 letters each indicate

that Plaintiff had received "[m]ultiple [l]umbar spine injections" and was also receiving opioid

therapy and physical therapy (*id.* at 340-41).  In one of the letters, Dr. Themistocle also indicated

that a neurosurgery consultation was "medically necessary."  (*See id.*)

Each of the questionnaires completed by Dr. Themistocle appears to be a standard form

used by Binder & Binder.  In response to the "Summary Impairment Questionnaire," dated

June 23, 2014, Dr. Themistocle stated that he had first treated Plaintiff on August 8, 2011, that

16

Plaintiff's most recent appointment had been on May 16, 2014, and that he treated Plaintiff on a monthly basis.  (*Id.* at 335.)  Dr. Themistocle indicated that Plaintiff's diagnoses included lumbosacral spondylosis, lumbar disc displacement, lumbosacral neuritis, neuralgia, neuritis, and radiculopathy,[29] citing the results of Plaintiff's MRI scans, conducted on August 25, 2011 (*see* Background, *supra*, at Section B(1)(b)), in support of those diagnoses (R. at 335).

Dr. Themistocle indicated that Plaintiff's medications included Neurontin, Elavil, Flexeril, and Mobic,[30] and that Plaintiff also received physical therapy.  (*Id.*)  Dr. Themistocle opined that, during an eight-hour workday, Plaintiff would be able to sit for three hours, and would be able to stand or walk for one hour, adding that Plaintiff could rarely or never lift and carry up to five pounds.  (*Id.* at 336.)  Dr. Themistocle also opined that Plaintiff had no limitations in reaching, handling, or fingering (*id.*), but that it was medically necessary for Plaintiff to elevate his legs to waist level while seated, on an as-needed basis.  (*Id.*)  Dr. Themistocle opined that Plaintiff was likely to be absent from work two to three times a month due to his impairments, and that Plaintiff's symptoms and limitations applied dating back to April 14, 2011 (*i.e.*, Plaintiff's alleged disability onset date).  Finally, Dr. Themistocle opined that Plaintiff was not a "malingerer," and that Plaintiff's impairments were expected to last at least 12 months.  (*Id.* at 335.)

In response to the "Spinal Impairment Questionnaire," dated October 10, 2014, Dr. Themistocle indicated that he continued to treat Plaintiff on a monthly basis, although

---

[29] Radiculopathy is "caused by compression, inflammation and/or injury to a spinal nerve root," resulting in radiating pain, numbness, or tingling. http://www.ninds.nih.gov/disorders/backpain/detail_backpain.htm (last accessed Dec. 16, 2016).

[30] Mobic, the brand name for meloxicam, is a nonsteroidal anti-inflammatory drug used to treat arthritis, including arthritis of the spine.  *See* https://medlineplus.gov/druginfo/meds/a601242.html (last accessed Dec. 16, 2016).

Dr. Themistocle also reported that Plaintiff's last appointment had been on July 18, 2014, and that Plaintiff would next be "reevaluated in [four] months."  (*Id.* at 343, 345.)  Dr. Themistocle stated that Plaintiff's diagnoses included lumbar radiculopathy and lumbar disc displacement, again citing to the results of Plaintiff's MRI scans, conducted on August 25, 2011.  (*Id.* at 343.)  Dr. Themistocle further stated that Plaintiff experienced lower back pain on a daily basis, which was exacerbated by bending, walking, or sitting for prolonged periods (*id.*), and that Plaintiff experienced tenderness and muscle spasms in the lower back, and had an antalgic gait (*id.* at 344).  Dr. Themistocle reported that Plaintiff was being medicated with Flexeril, Neurontin, and Lortab[31] (*id.* at 345), and was being referred for physical therapy and a neurosurgery consultation for a "possible spinal cord stimulator trial"[32] (*id.*).

In responding to this second questionnaire, Dr. Themistocle offered a somewhat different assessment of Plaintiff's various limitations from that offered in the prior questionnaire. Dr. Themistocle continued to opine that Plaintiff could be seated for three hours during an eight-hour work day, but now opined that Plaintiff could stand or walk for two hours during an eight-hour work day.  (*Id.* at 345.)  Dr. Themistocle now also opined that Plaintiff could occasionally lift and carry up to 10 pounds.  (*Id.* at 346.)  Further, Dr. Themistocle now opined that Plaintiff was limited in his reaching, handling, and fingering abilities, and that Plaintiff could only occasionally grasp, turn, and twist objects, use his arms for reaching, and use his

---

[31] Lortab is a brand name for a medication containing acetaminophen and hydrocodone, an opioid used to treat pain.  *See* https://medlineplus.gov/ency/article/002670.htm (last accessed Dec. 16, 2016).

[32] Spinal cord stimulation is a surgical technique in which an electrode is placed next to the spinal cord.  "[A] mild electric current" is used "to block nerve impulses in the spine," which may reduce pain in some patients.  This technique may be used to treat chronic back pain, and is used after "other treatments such as medicines and exercise . . . have not worked." https://medlineplus.gov/ency/article/007560.htm (last accessed Dec. 28, 2016).

hands and fingers for fine manipulations.  (*Id.* at 347.)  Dr. Themistocle stated that it was

medically necessary for Plaintiff to elevate his legs up to six inches, every two to three hours.

(*Id.* at 346.)  Dr. Themistocle also stated that Plaintiff could not sit continuously, but rather, had

to "move around" for 15 to 20 minutes, every two to three hours.  (*Id.*)  With respect to

Plaintiff's walking abilities, Dr. Themistocle indicated that Plaintiff did not require use of a cane,

and could carry out routine shopping or banking activities and climb "a few stairs," but that

Plaintiff could not walk on rough or uneven surfaces or use standard public transportation.  (*Id.*)

Dr. Themistocle further indicated that Plaintiff's pain and other symptoms would

"occasionally" be severe enough to interfere with Plaintiff's attention and concentration during

the work day, and that Plaintiff would need one or two unscheduled breaks of 15 to 20 minutes'

duration each day.  (*Id.*)  Dr. Themistocle opined that Plaintiff would likely be absent from work

for two or three days each month due to his impairments.  (*Id.*)  Dr. Themistocle indicated that

Plaintiff's symptoms would likely increase if he "were placed in a competitive work

environment," that Plaintiff's symptoms and limitations dated back at least to August of 2011

and were likely to last at least 12 additional months, and that Plaintiff was not a "malingerer."

(*See id.* at 347-48.)

### 4. New Evidence Submitted to This Court, Outside the Administrative Record

In connection with his cross-motion for judgment on the pleadings, Plaintiff has now

submitted certain additional medical records (*see* Dkt. 18, at 8-28), all of which either post-date

the Appeals Council's July 2, 2015 denial of his request for review, or are duplicates of materials

in the Record.

First, Plaintiff has submitted certain documents related to his ongoing treatment by pain-

management specialist Dr. Themistocle.  These documents include:

(a)   a letter from Dr. Themistocle, addressed to Plaintiff himself
and dated March 26, 2015, in which Dr. Themistocle
indicated, as in a previous letter, that it was "medically
necessary" for Plaintiff to be referred to "[n]eurosurgery for
consultation" (*see id.*, at 8);

(b)   treatment notes from an October 14, 2015 visit to
Dr. Themistocle, during which Plaintiff underwent a right
lumbar facet joint radiofrequency rhizotomy (*id.* at 4, 9-13);
these notes state that, on physical examination, Plaintiff was
able to "ambulate with no aid" (*id.* at 12), but that
Dr. Themistocle had encouraged Plaintiff to continue taking
Mobic, Neurontin, and Flexeril, to have physical therapy, and
to undertake "[a]ctivity as tolerated" (*id.* at 9-10); and

(c)   a "Physical Therapy Referral" form, dated April 28, 2016, in
which Dr. Themistocle indicated that Plaintiff had been
diagnosed with lumbago (*id.* at 15) – this form was otherwise
left blank, failing to specify, for example, how often Plaintiff
should receive physical therapy (*see id.*).

Second, Plaintiff has submitted a number of miscellaneous treatment records associated

with visits to additional providers, including the emergency room of Lincoln Medical and Mental

Health Center in the Bronx, New York ("Lincoln Medical").  As relevant to his claimed

disability, these records include:

(d)   an "Emergency Instructions" sheet and attached instructions
on use of an Epi-Pen, dated July 15, 2015, and apparently
related to allergen immunotherapy[33] treatment that Plaintiff
received from Dr. Lazar Feygin of Parkville Medical Health
P.C. (*see id.* at 18-19);

(e)   a Patient Discharge Report and a copy of a prescription for
prednisone,[34] each dated June 1, 2016, from Lincoln Medical

---

[33] "Allergen immunotherapy involves exposing a patient to a gradually escalating dose of
a specific allergen with the intention of decreasing allergic and inflammatory responses."
http://www.mayoclinicproceedings.org/article/S0025-6196(11)61374-8/abstract (last accessed
Dec. 19, 2016).

[34] Prednisone is a corticosteroid medication used to treat a variety of conditions,
including certain lung conditions, certain types of arthritis, and severe allergic reactions.  *See*
https://medlineplus.gov/druginfo/meds/a601102.html (last accessed Dec. 19, 2016).

(*id.* at 5-7); the report indicates that Plaintiff had been diagnosed by Eunice Mello, P.A. with "[m]ild intermittent asthma, uncomplicated," and discharged "[t]o home or [s]elf [c]are" (*id.* at 6);

(f)  a form dated July 6, 2016, partially filled out by a provider[35] with Doctors United, in the Bronx (*id.* at 16); the individual who filled out this form stated that Plaintiff had been seen on the stated date for physical therapy, but left blank sections of the form calling for information regarding Plaintiff's functional limitations, stating only: "[i]f you have any questions[,] feel free to call" (*id.*); and

(g)  a pharmacy prescription print-out already contained in the Record (*id.* at 14; *see also* R. at 252), as well as newly-submitted prescription records from Crotona Pharmacy Corp. in the Bronx, reflecting prescriptions Plaintiff had filled during the period from July 2, 2015 through June 1, 2016 (*id.* Dkt. 18 at 20-28).[36]

## C. Procedural History

### 1. Plaintiff's Application for Benefits and Initial Denial

Plaintiff applied for SSI benefits on December 21, 2012, alleging that he had become disabled as of April 14, 2011, as a result of (as noted above) his lower back pain, chronic pain syndrome, mild facet arthrosis, lumbosacral spondylosis, lumbar disc displacement, lumbosacral neuritis, lumbago, arthritis, asthma, and high cholesterol. (*See* R. at 168-74, 207.)  His claims were denied on February 13, 2013 (*id.* at 79-84), and, on February 26, 2013, Plaintiff requested a hearing before an ALJ (*id.* at 85-87).

---

[35] The signature of this provider is only partly legible.  The signer's first name is clearly shown as "Frances," but this Court cannot be certain of the signer's surname (*see id.*), and has been unable to determine it from public sources.

[36] The documents submitted by Plaintiff also included a copy of an August 8, 2016 referral for a psychiatric consultation, which indicated that Plaintiff had been diagnosed with post-traumatic stress disorder.  (*See id.* at 17; *but see* n.7, *supra* (noting that Plaintiff has not claimed disability based on any psychiatric condition).)

##### 2.    <u>Administrative Hearing and Decision Denying Benefits</u>

On April 17, 2014, Plaintiff appeared at a hearing before ALJ Miller, at which Plaintiff

and a vocational expert, Andrew Vaughn ("Vaughn"), testified.  (*See id.* at 34-69, 165-66.)

Plaintiff was apparently represented by an attorney, although that attorney's name is not reflected

in the hearing transcript.  (*See id.* at 34-69.)  At the outset of the hearing, Plaintiff's counsel

requested "some time to obtain some outstanding records" (*id.* at 36), and the ALJ "grant[ed]

[Plaintiff] 15 days to request additional records" (*id.* at 36-37).

Plaintiff then testified as to his work history, stating that his last full-time work, from

2006 to 2011, was as a bridge painter for various private contractors.  (*Id.* at 37-38.)  Plaintiff

testified that he had lifted up to 89 pounds as a bridge painter, but was laid off in 2011, as his

back pain had prevented him from performing the work.  (*Id.* at 38.)  Plaintiff testified that, from

the time he was laid off as a bridge painter until December of 2012, he was employed "off-the-

books" by an extermination company, first performing field work and then performing office

duties when the former proved "too much" for him.  (*Id.* at 40.)  Plaintiff, however, had also

struggled with office work, as the office position had required him to sit for "a few hours" and to

lift copy paper and supplies weighing up to 15 or 20 pounds.  (*Id.* at 40-41.)  According to

Plaintiff, he had not worked at all since December of 2012.  (*Id.* at 41.)

Plaintiff next testified regarding his work capabilities as of the time of the hearing,

indicating that he could lift 10 to 12 pounds, at most.  (*Id.*)  Plaintiff also testified that he was

able to sit for 30 minutes and stand for 30 minutes, in an alternating fashion.  (*Id.* at 46.)  When

the ALJ asked whether Plaintiff could perform a "hypothetical job where [he] could sit and stand

as [he] wanted to and lift less than ten pounds," Plaintiff responded that he was "pretty sure [he]

could do that."  (*Id.* at 42-43.)  When the ALJ expanded on this hypothetical, however, asking

whether Plaintiff could perform the role of a surveillance-systems monitor (*i.e.*, a job watching a monitor, "in a security type job"), Plaintiff testified that his narcotic medication put him "in a sleeping way," such that he would "definitely fail" at such a job.  (*Id.* at 43-44.)  In response to questioning by his attorney, Plaintiff added that he had to lie down multiple times each day to relieve his back pain and spasms, for a total of five to six hours each day, and that he would "definitely" need to lie down during the course of an eight-hour work day.  (*Id.* at 48-49.) Plaintiff also added that he frequently lost his balance, due to pain radiating to his knees and the fact that his feet would "always fall asleep."  (*Id.* at 49.)

In response to questions regarding his daily activities, Plaintiff testified that his hobbies included watching television and walking one or two blocks, at "the most," a few days each week.  (*Id.* at 44, 47.)  Plaintiff elaborated that he often slept during the day, as his energy level was "[v]ery, very low."  (*Id.* at 51.)  Plaintiff also stated, though, that he attended his son's boxing matches, and that he "occasionally" drank alcohol at parties or events.  (*Id.* at 46-47.) Plaintiff testified that he had arrived at the hearing by public transportation.  (*Id.* at 44.)  He also testified that he "mostly" bought prepared food, so as to "avoid standing by the stove," and that he would do "light chores" around the house, such as throwing out relatively light bags of garbage.  (*Id.* at 44-45.)  Plaintiff testified that his mother helped him with cleaning and other chores (*id.* at 45), and that his spouse also visited him approximately four times a week to assist him with activities such as mopping, sweeping, taking out the garbage, and cooking (*id.* at 51). According to Plaintiff, he took only short baths, as standing in the shower caused him pain.  (*Id.*)

Plaintiff testified that he had high cholesterol, but that it was controlled with medication. (*Id.* at 46-48.)  Plaintiff also testified that he had lost 30 percent of his hearing following removal of a childhood tumor, and that he went to an ear, nose, and throat doctor every six months "for

draining" of his left ear.  (*Id.* at 46-47.)  Plaintiff added that he sometimes had difficulty hearing

on the telephone, and had to ask callers to repeat themselves, but that he chose not to wear a

hearing aid.  (*Id.* at 47.)

According to Plaintiff, he had "multiple bulging disks, arthritis, [and a] disintegrating

spinal cord," which caused him severe pain.  (*Id.* at 37.)  Plaintiff indicated that his pain was

"mainly" located in his lower back, where he experienced "a burning sensation" and felt like

someone was "poking" him with a knife.  (*Id.* at 49-50.)  As treatment for his back pain, Plaintiff

testified that he had seen a chiropractor and had received acupuncture and physical therapy, and

that he had also received an unspecified number of epidural steroid injections in his lower spine.

(*Id.* at 50.)  Plaintiff also testified that he took oxycodone, Flexeril, Neurontin, and Elavil as

treatment, which he felt had been "helpful," but which left him "like a zombie" and caused him

to feel nauseated three times a week.  (*Id.* at 52.)  Plaintiff added that, when on medication, his

pain was reduced by "half," but that on rainy or extremely cold days, his pain worsened.  (*Id.*

at 52-53.)

Following Plaintiff's testimony, the ALJ then took testimony from the vocational expert,

Vaughn.  The ALJ first asked Vaughn whether there were any available jobs in the national and

local economies for a hypothetical individual with the same age, education, and work experience

as Plaintiff, that would involve lifting or carrying up to 10 pounds frequently; standing or

walking with normal breaks for two hours, and sitting with normal breaks for six hours, in an

eight-hour work day, but with a "sit/stand option with the ability to alternate positions every

30 minutes"; occasional climbing of ramps and stairs, but not the use of ladders, ropes, or

scaffolds; and occasional kneeling, crouching, squatting, crawling, and balancing; and that would

not require fine hearing capabilities or telephone communication.  (*Id.* at 56-57.)  The ALJ

24

additionally specified that the available jobs should permit Plaintiff to "[a]void even moderate exposure to odors, dusts, fumes, gases, poor ventilation, toxic dust, chemicals and other respiratory irritants," and should involve "no more than" a moderate noise level, where "moderate" would mean, for example, "a business environment where typewriters are used[,] or a department store or a grocery store . . . environment," or a "traffic type noise level." (*Id.* at 57.)

Vaughn initially testified that such an individual could perform the jobs of lens inserter (DOT Code 713.687-026), check-cashing cashier (DOT Code 211.462-026), and railroad transportation reservation clerk (DOT Code 238-367-014).[37] (*Id.* at 58.) Vaughn added that each of those jobs could also be performed by a hypothetical individual not subject to a "hearing limitation." (*Id.* at 59.) When questioned by Plaintiff's attorney, however, Vaughn admitted that the reservation clerk position could involve taking telephone calls, and the ALJ accordingly requested an additional example job suitable for a hypothetical individual with hearing limitations, as described. (*Id.* at 63.) Vaughn testified that such an individual could serve as an addressing clerk (DOT Code 209.587-010) – a position involving "adhering pre-addressed stickers to envelopes . . . and stuffing those envelopes." (*Id.* at 63-64.) In further response to questioning by Plaintiff's attorney, Vaughn testified that a hypothetical individual with the same age, education, and work experience as Plaintiff, who "had to lie down during the workday for two hours," would be "preclude[d from] full-time employment." (*Id.* at 62.)

On June 19, 2014, the ALJ denied Plaintiff's application for SSI benefits (*id.* at 18-33), in a decision that is discussed in detail below. (*See* Discussion, *infra*, at Section II.)

---

[37] The codes cited by Vaughn are found in the U.S. Dep't of Labor, *Dictionary of Occupational Titles* ("DOT") (4th ed. 1991).

### 3.      Plaintiff's Request for Review by the Appeals Council

On July 8, 2014, Plaintiff filed a request with the Appeals Council for review of the

ALJ's decision, and, on July 2, 2015, the Appeals Council denied Plaintiff's request for review.

(*Id.* at 1-6, 14-17.)  The notice of denial of review stated that the Appeals Council had reviewed

the additional evidence that Plaintiff had provided related to Plaintiff's treatment by pain

management specialist Dr. Themistocle (*see* Background, *supra*, at Section B(3)), but had found

that the "information [did] not provide a basis for changing the [ALJ's] decision" (*see* R.

at 1-2, 5).

### 4.      The Current Action and the Motions Before the Court

On September 8, 2015, acting *pro se*, Plaintiff filed his Complaint in this action, alleging

that the ALJ's decision "was erroneous, not supported by substantial evidence in the [R]ecord,

and/or contrary to law."  (Complaint, dated Sept. 8, 2015 ("Compl.") (Dkt. 2), ¶ 9.)  After

requesting and receiving an extension of time to respond to the Complaint (*see* Dkts. 8-9),

Defendant filed an Answer on February 10, 2016, accompanied by a copy of the Record (*see*

Dkts. 10-11).  On that same date, Defendant also filed a motion pursuant to Rule 12(c) of the

Federal Rules of Civil Procedure for judgment on the pleadings (*see* Dkt. 12), and a

memorandum of law in support of that motion (*see* Memorandum of Law in Support of the

Commissioner's Motion for Judgment on the Pleadings, dated Feb. 10, 2016 ("Def. Mem.")

(Dkt. 13)).

On September 6, 2016, after requesting and receiving two extensions of time (*see*

Dkts. 15-17, 20), Plaintiff filed his opposition to Defendant's motion for judgment on the

pleadings, contending that the motion should be denied because of the severity of Plaintiff's

ongoing back pain and asthma, and because his twice-daily use of oxycodone over the prior four

years had made it "impossible to work in any field," as Plaintiff would "endanger [himself] and any business." (*See* Declaration in Opposition to Motion, dated Sept. 6, 2016 ("Pl. Opp.") (Dkt. 18), at 3.)  As noted above, Plaintiff submitted a number of medical records in conjunction with his opposition.  (*See* Background, *supra*, at Section B(4).)  Plaintiff filed no separate cross-motion, but, given this Court's obligation to construe *pro se* papers liberally to raise the strongest arguments they suggest, *see Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (collecting authority), this Court construes Plaintiff's opposition as a cross-motion for judgment on the pleadings in his favor, pursuant to Rule 12(c), *see Houston v. Colvin*, No. 12cv03842 (NGG), 2014 WL 4416679, at *2 n.3 (E.D.N.Y. Sept. 8, 2014) (construing *pro se* plaintiff's opposition to defendant's motion for judgment on the pleadings as a cross-motion for judgment on the pleadings).

On September 23, 2016, after receiving an extension of time (*see* Dkts. 19, 21), Defendant filed a reply to Plaintiff's opposition (*see* Reply Memorandum of Law in Further Support of the Commissioner's Motion for Judgment on the Pleadings ("Def. Rep. Mem."), dated Sept. 23, 2016 (Dkt. 22)).

## DISCUSSION

## I.   APPLICABLE LEGAL STANDARDS

### A.   Standard of Review

Judgment on the pleadings under Rule 12(c) is appropriate where "the movant establishes 'that no material issue of fact remains to be resolved,'" *Guzman v. Astrue*, No. 09cv3928 (PKC), 2011 WL 666194, at *6 (S.D.N.Y. Feb. 4, 2011) (quoting *Juster Assocs. v. City of Rutland*, 901 F.2d 266, 269 (2d Cir. 1990)), and a judgment on the merits can be made "'merely by considering the contents of the pleadings,'" *id*. (quoting *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2d Cir. 1988)).

Judicial review of a decision of the Commissioner is limited.  The Commissioner's decision is final, provided that the correct legal standards are applied and findings of fact are supported by substantial evidence.  42 U.S.C. § 405(g); *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000).  "[W]here an error of law has been made that might have affected the disposition of the case, [a] court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ."  *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (quoting *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984)).  Thus, the first step is to ensure that the Commissioner applied the correct legal standards.  *See Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999); *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987).

The next step is to determine whether the Commissioner's decision is supported by substantial evidence.  *See Tejada*, 167 F.3d at 773.  Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted).  In making this determination, a court must consider the underlying record.  The reviewing court does not, however, decide *de novo* whether a claimant is disabled.  *See Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002) ("Where the Commissioner's decision rests on adequate findings supported by evidence having rational probative force, we will not substitute our judgment for that of the Commissioner."); *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998); *Beauvoir v. Chater*, 104 F.3d 1432, 1433 (2d Cir. 1997).  Thus, if the correct legal principles have been applied, this Court must uphold the Commissioner's decision upon a finding of substantial evidence, even where contrary evidence exists.  *See Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder."); *see*

*also DeChirico v. Callahan*, 134 F.3d 1177, 1182-83 (2d Cir. 1998) (affirming decision where substantial evidence supported both sides).

### B.        The Five-Step Sequential Evaluation

To be entitled to disability benefits under the Act, a claimant must establish his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A); *Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998). An individual is considered to be under a disability only if the individual's physical or mental impairments are of such severity that he or she is not only unable to do his or her previous work, but also cannot, considering his or her age, education, and work experience, engage in any other kind of substantial gainful work that exists in the national economy. 42 U.S.C. § 1382c(a)(3)(B).

In evaluating a disability claim, an ALJ must follow the five-step procedure set out in the regulations governing the administration of Social Security benefits. *See* 20 C.F.R. § 416.920; *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam). Throughout the inquiry, the ALJ must consider four primary sources of evidence: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." *Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999) (citations omitted).

The first step of the inquiry requires the ALJ to determine whether the claimant is engaged in substantial gainful activity. 20 C.F.R. § 416.920(a)(4)(i). If not, at the second step, the ALJ determines whether the claimant has a "severe" impairment or combination of impairments that significantly limits his or her physical or mental ability to do basic work

activities. *Id.* §§ 416.920(a)(4)(ii), (c). If the claimant does suffer from such an impairment, then the third step requires the ALJ to determine whether this impairment meets or equals an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (the "Listings"). *Id.* § 416.920(a)(4)(iii). If it does, then the claimant is presumed to be disabled "without considering [the claimant's] age, education, and work experience." *Id.*

If the claimant's impairment does not meet or equal a listed impairment, then the ALJ must determine, based on all the relevant evidence in the record, the claimant's residual functional capacity ("RFC"), or ability to perform physical and mental work activities on a sustained basis. *Id.* § 416.945. The ALJ then proceeds to the fourth step of the inquiry, which requires the ALJ to determine whether the claimant's RFC allows the claimant to perform his or her "past relevant work." *Id.* § 416.920(a)(4)(iv). Finally, if the claimant is unable to perform his or her past relevant work, the fifth step requires the ALJ to determine whether, in light of the claimant's RFC, age, education, and work experience, the claimant is capable of performing "any other work" that exists in the national economy. *Id.* §§ 416.920(a)(4)(v), (g).

On the first four steps of the five-step evaluation, the claimant generally bears the burden of establishing facts to support his or her claim. *See Berry*, 675 F.2d at 467 (citation omitted). At the fifth step, the burden shifts to the Commissioner to "show that there is work in the national economy that the claimant can do." *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009); *see also Bluvband v. Heckler*, 730 F.2d 886, 891 (2d Cir. 1984). The Commissioner must establish that the alternative work "exists in significant numbers" in the national economy and that the claimant can perform this work, given his or her RFC and vocational factors. 20 C.F.R. § 416.960(c)(2).

Where the claimant only suffers from exertional impairments, the Commissioner can satisfy this burden by referring to the Medical-Vocational Guidelines, set out in 20 C.F.R. Pt. 404, Subpt. P, App. 2 (the "Grids").  Where, however, the claimant suffers from nonexertional impairments that "'significantly limit the range of work permitted by his [or her] exertional limitations,'" the ALJ is required to consult with a vocational expert," rather than rely exclusively on these published Grids.  *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (quoting *Bapp v. Bowen*, 802 F.2d 601, 604-05 (2d Cir. 1986) (citations omitted)). "A nonexertional impairment 'significantly limit[s]' a claimant's range of work when it causes an 'additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity.'"  *Id*. at 410-11 (quoting *Bapp*, 802 F.2d at 605-06).

### C.   The Treating Physician Rule

The medical opinion of a treating source as to "the nature and severity of [a claimant's] impairments" is entitled to "controlling weight," where the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record."  20 C.F.R. § 416.927(c)(2).  "[T]reating source" is defined as the claimant's "own physician, psychologist, or other acceptable medical source who . . . has provided [the claimant] with medical treatment or evaluation" and who has had "an ongoing treatment relationship" with him or her.  20 C.F.R. § 416.902.  Treating physicians' opinions are generally accorded deference because treating physicians "are likely to be the medical professionals most able to provide a detailed, longitudinal picture" of a claimant's condition and "bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as

31

consultative examinations."  20 C.F.R. § 416.927(c); *see Taylor v. Barnhart*, 117 F. App'x 139,

140 (2d Cir. 2004).

Where an ALJ determines that a treating physician's opinion is not entitled to

"controlling weight," the ALJ must "give good reasons" for the weight accorded to the opinion.

20 C.F.R. § 416.927(c)(2).  Failure to "give good reasons" is grounds for remand.  *Halloran v.*

*Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004) ("We do not hesitate to remand when the

Commissioner has not provided 'good reasons' for the weight given to a treating physician's

opinion . . . .").  Moreover, in determining the weight to be accorded to an opinion of a treating

physician, the ALJ "must apply a series of factors," *Aronis v. Barnhart*, No. 02cv7660 (SAS),

2003 WL 22953167, at *5 (S.D.N.Y. Dec. 15, 2003) (citing 20 C.F.R. § 416.927(d)(2)[38]),

including:  (1) the length of the treatment relationship and the frequency of examination; (2) the

nature and extent of the treatment relationship, including whether the treatment received was

particular to the claimant's impairment; (3) the supportability of the physician's opinion; (4) the

consistency of the physician's opinion with the record as a whole; and (5) the specialization of

the physician providing the opinion, 20 C.F.R. §§ 416.927(c)(2)-(5); *see Shaw*, 221 F.3d at 134

(noting that these five factors "must be considered when the treating physician's opinion is not

given controlling weight"); *Rolon v. Comm'r of Soc. Sec.*, 994 F. Supp. 2d 496, 507 (S.D.N.Y.

2014) (requiring an ALJ to "explicitly consider" the factors in order to "override the opinion of a

treating physician" (quoting *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013)).

Even where a treating physician's opinion is not entitled to "controlling weight," it is

generally entitled to "more weight" than the opinions of non-treating and non-examining

---

[38] On February 23, 2012, the Commissioner amended 20 C.F.R. § 416.927, by, among
other things, removing paragraph (c), and re-designating paragraphs (d) through (f) as paragraphs
(c) through (e).

sources.  20 C.F.R. § 416.927(c)(2); *see* Social Security Ruling 96-2p (S.S.A. July 2, 1996) ("In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight."); *see also Gonzalez v. Apfel*, 113 F. Supp. 2d 580, 589 (S.D.N.Y. 2000).  A consultative physician's opinion, by contrast, is generally entitled to "little weight."  *Giddings v. Astrue*, 333 F. App'x 649, 652 (2d Cir. 2009) (internal quotation marks and citation omitted).  This is because consultative examinations "are often brief, are generally performed without benefit or review of the claimant's medical history, and, at best, only give a glimpse of the claimant on a single day.  Often, consultative reports ignore or give only passing consideration to subjective symptoms without stated reasons." *Simmons v. U.S. R.R. Ret. Bd.*, 982 F.2d 49, 55 (2d Cir. 1992) (internal quotation marks and citation omitted).

### D.    Duty To Develop the Record

"Because a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record," *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996) (citing *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982)), and failure to develop the record may be grounds for remand, *Rosa v. Callahan*, 168 F.3d 72, 82-83 (2d Cir. 1999).  "[W]here there are deficiencies in the record, an ALJ is under an affirmative obligation to develop a claimant's medical history 'even when the claimant is represented by counsel.'"  *Id.* at 79 (quoting *Perez*, 77 F.3d at 47).  The SSA regulations explain this duty to claimants this way:

> Before we make a determination that you are not disabled, we will develop your complete medical history . . . [and] will make every reasonable effort to help you get medical reports from your own medical sources when you give us permission to request the reports. . . .  'Every reasonable effort' means that we will make an initial request for evidence from your medical source and, at any

> time between 10 and 20 calendar days after the initial request, if
> the evidence has not been received, we will make one followup
> request to obtain the medical evidence necessary to make a
> determination.

20 C.F.R. §§ 416.912(d), (d)(1).  The regulations further explain that a claimant's "complete

medical history" means the records of his or her "medical source(s)."  *Id.* § 416.912(d)(2).  If the

information obtained from medical sources is insufficient to make a disability determination, or

if the ALJ is unable to seek clarification from treating sources, the regulations also provide that

the ALJ should ask the claimant to attend one or more consultative evaluations.  20 C.F.R.

§§ 416.912(e), 416.917.

     Where there are no "obvious gaps" in the record and where the ALJ already "possesses a

complete medical history," the ALJ is "under no obligation to seek additional information in

advance of rejecting a benefits claim."  *Swiantek v. Comm'r of Soc. Sec.*, 588 F. App'x 82, 84

(2d Cir. 2015) (summary order) (quoting *Rosa*, 168 F.3d at 79 n.5).

     **E.**    **Consideration of New Evidence**

     When "new and material evidence," which was not before the ALJ, is submitted to the

Appeals Council upon an administrative appeal, the Appeals Council is required to consider that

evidence, to the extent it "relates to the period on or before the date of the [ALJ] hearing

decision."  20 C.F.R. § 416.1476(b).  If the Appeals Council denies review of the ALJ's

decision, the record before the reviewing court will then include the new evidence.  *Perez*, 77

F.3d at 46.[39]  In other words, "[w]hen the Appeals Council denies review after considering new

---

[39] Although this is the rule within the Second Circuit, there is a split between the circuits as to whether evidence submitted to the Appeals Council after the ALJ issues his or her decision becomes part of the record on appeal when the Appeals Council denies review.  *See Eads v. Sec'y of the Dep't of Health and Human Servs.*, 983 F.2d 815, 818 (7th Cir. 1993) ("courts may not reverse an [ALJ's] decision on the basis of evidence first submitted to the Appeals Council"); *Cotton v. Sullivan*, 2 F.3d 692, 695-96 (6th Cir. 1993) (adopting the reasoning in *Eads*).

evidence," the task of the reviewing court is to "review the entire administrative record, which includes the new evidence, and determine, as in every case, whether there is substantial evidence to support the [agency's] decision."  *Id*.

Additionally, when a plaintiff provides new and material evidence to a court to support his claim, the court may remand based on that evidence, provided there is good cause for its omission from the administrative record.  42 U.S.C. § 405(g); *see also Lisa v. Secretary of Health and Human Servs.*, 940 F.2d 40, 43 (2d Cir. 1991); *Fortier v. Astrue*, No. 09cv0993, 2010 WL 1506549, at *20 (S.D.N.Y. Apr. 13, 2010).  The evidence must be both new – that is, "not merely cumulative of [evidence] already in the record," *Tirado v. Bowen*, 842 F.2d 595, 597 (2d Cir. 1988); *Harris-Batten v. Comm'r of Social Security*, No. 05cv7188, 2012 WL 414292, at *6 (S.D.N.Y. Feb. 9, 2012) – and material – that is, relevant to the time period at issue and probative, such that it is reasonably possible that such evidence would have influenced the Commissioner to decide the claim differently, *id.*  A plaintiff who is providing additional evidence has the burden of demonstrating that good cause exists for the failure to present the evidence earlier.  *Lisa*, 940 F.2d at 43; *Tirado*, 842 F.2d at 597.

## II.   THE ALJ'S DECISION

On June 19, 2014, the ALJ issued a decision finding that Plaintiff had not been disabled since December 21, 2012, the date of Plaintiff's application for benefits.  (*See generally* R. at 21-33.)  In reaching this decision, the ALJ applied the five-step sequential evaluation procedure.

### A.   Steps One Through Three of the Sequential Evaluation

At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since December 21, 2012, the date that Plaintiff filed his application for SSI.  (*Id.* at 23.)

At step two, the ALJ determined that, during the period at issue, Plaintiff suffered from the severe impairments of asthma and internal derangement of the lumbosacral spine, reasoning that these impairments were severe because they "significantly limit[ed] [Plaintiff's] ability to engage in work-related activities."  (*Id.*)  The ALJ concluded that, while Plaintiff also "allege[d] disability due to high cholesterol and a hearing disorder," those impairments were not severe, as the evidence "[did] not establish" that those impairments significantly limited Plaintiff's ability to engage in work-related activities.  (*Id.*)

At step three, the ALJ determined that Plaintiff's severe impairments did not meet or medically equal a condition included in the Listings.  (*Id.*)  Specifically, the ALJ found that Plaintiff's "lumbar spine impairment" did not satisfy Listing 1.04 (disorders of the spine), as the "record [did] not establish" that Plaintiff either had "nerve root compression characterized by neuro-anatomic distribution of pain," spinal arachnoiditis, or lumbar spinal stenosis producing pseudo-claudication,[40] as required.  (*Id.*)  The ALJ also found that Plaintiff's asthma did not satisfy Listing 3.03 (asthma), as the "evidence [did] not establish," as required, that Plaintiff suffered from chronic asthmatic bronchitis, or that Plaintiff had suffered asthma attacks "in spite of prescribed treatment and requiring physician intervention" that occurred "at least once every two months or at least six times a year."  (*Id.*)

---

[40] Spinal arachnoiditis is "a pain disorder caused by inflammation of the arachnoid, one of the membranes that surround and protect the nerves of the spinal cord." https://www.ninds.nih.gov/Disorders/All-Disorders/Arachnoiditis-Information-Page (last accessed Dec. 21, 2016).  Pseudo-claudication causes leg pain, and "can be a symptom of lumbar spinal stenosis, a condition that occurs when the spaces narrow between the vertebrae" of the lower back.  http://www.mayoclinic.org/diseases-conditions/spinal-stenosis/expert-answers/pseudoclaudication/faq-20057779 (last accessed Dec. 21, 2016).

B.    **The ALJ's Assessment of Plaintiff's RFC**

Before proceeding to step four, the ALJ assessed Plaintiff's RFC, finding that Plaintiff

had "the residual capacity to perform sedentary work as defined in 20 CFR 416.967(a),"[41] except

that he could lift or carry up to 10 pounds frequently.  (*Id*. at 24.)  Additionally, the ALJ found

that Plaintiff had the capacity to "stand and/or walk with normal breaks for a total of about two

hours . . . and sit with normal breaks for a total of about six hours in an eight hour workday," and

"occasionally [to] kneel, crouch, squat, crawl, balance, and climb ramps and stairs," but that

Plaintiff could not climb ladders, ropes, or scaffolds, that he "need[ed] to avoid even moderate

exposure to odors, dust, fumes, gases, poor ventilation, toxic dusts, chemicals, and other

respiratory irritants," and that he "require[d] a sit/stand option every 30 minutes."  (*Id.*)

In making these findings, the ALJ stated that he had "considered all [of Plaintiff's]

symptoms and the extent to which these symptoms [could] reasonably be accepted as consistent

with the objective medical evidence," and that he had also considered opinion evidence.  (*Id.*)

The ALJ then followed the two-step process used to assess the credibility of a claimant's

subjective accounts of his symptoms, first determining whether Plaintiff had "underlying

medically determinable physical or mental impairments(s) . . . that could reasonably be expected

to produce [his] pain or other symptoms," and then proceeding to "evaluate the intensity,

persistence, and limiting effects of [Plaintiff's] symptoms to determine the extent to which they

limit[ed] [his] functioning."  (*Id.*)  The ALJ concluded that, while Plaintiff's "medically

determinable impairments could reasonably be expected to cause [his] alleged symptoms,"

---

[41] Sedentary work "involves lifting no more than 10 pounds at a time and occasionally
lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is
defined as one which involves sitting, a certain amount of walking and standing is often
necessary in carrying out job duties."  20 C.F.R. § 416.967(a).

Plaintiff's "statements concerning the intensity, persistence, and limiting effects of [his] symptoms [were] not entirely credible." (*Id.*)

In connection with this credibility determination, the ALJ noted Plaintiff's claim of lower back pain, and summarized Plaintiff's testimony regarding his trouble with balance, poor circulation, and tendency for his feet to "fall asleep." (*Id.*) The ALJ acknowledged that Plaintiff had testified that he needed to lie down every day, for a total of five to six hours each day, as a result of his back pain and spasms, and that he could sit for 30 minutes and stand for 30 minutes, alternating between those positions. (*Id.*) The ALJ also cited Plaintiff's testimony that he had "lost 30% of his hearing." (*Id.*)

The ALJ then discussed the medical evidence, first noting that, while Plaintiff had a history of asthma, there was "no evidence . . . that [Plaintiff] [had] sought or received any medical treatment" for his asthma "from October 2008 until August 2011." (*Id.* at 25.) The ALJ noted that Plaintiff had sought treatment from an unidentified physician at All Med on August 19, 2011 "for complaints of back and right elbow pain," but that, except for yielding findings of "possible lipomas, asthma and back derangement," Plaintiff's physical examination, at that time, was generally "unremarkable." (*Id.*) The ALJ also noted that a subsequent MRI of Plaintiff's lumbar spine, conducted on August 25, 2011, had "revealed a bulging L4-5 disc resulting in mild stenosis in conjunction with mild facet arthrosis, and mild L5-S1 facet arthrosis, but no focal disc herniations," and that an MRI of Plaintiff's right elbow, conducted on October 17, 2011, had "revealed triceps tendinosis but no discrete tear." (*Id.*) The ALJ further stated that, while Plaintiff had returned to All Med on October 17, 2011 "with complaints of constant back pain," there was "no evidence" that Plaintiff then "sought or received any further medical treatment until April 2012," when he returned to All Med for a follow-up visit. (*Id.*)

With respect to Plaintiff's next appointment at All Med, on October 8, 2012, the ALJ noted that a physical examination conducted by internist Dr. Martin had "revealed tenderness of the . . . lumbar spine," but that Plaintiff's "lungs were clear." (*Id.*) The ALJ noted that Dr. Martin had examined Plaintiff again on January 11, 2013, and had again found Plaintiff's lungs to be clear. (*Id.* at 25-26.)

The ALJ reviewed in some detail the treatment notes from Plaintiff's December 12, 2012 visit to pain-management specialist Dr. Themistocle, observing that those notes indicated that Plaintiff "had previously been diagnosed with chronic pain syndrome, lumbosacral spondylosis, lumbar disc displacement, lumbosacral neuritis and lumbago," but that Plaintiff "had undergone [a] caudal epidural steroid injection, [a] lumbar medial branch block, and [a] transforaminal selective nerve block[,] followed by overall good improvement regarding his lumbar pain." (*Id.* at 25.) The ALJ also observed that, according to Dr. Themistocle's notes, Plaintiff's "medication had helped with his activities of daily living, and he had [experienced] no side effects." (*Id.*) The ALJ noted that Dr. Themistocle's physical examination of Plaintiff on December 12, 2012 had revealed certain abnormalities, including "tenderness and spasm upon palpation over the paravertebral area" of Plaintiff's lumbar spine, and that Plaintiff, at the appointment, had undergone a "left lumbar facet joint radiofrequency rhizotomy." (*Id.*) The ALJ also noted that Plaintiff had apparently been given prescriptions for Neurontin, Elavil, Flexeril, and oxycodone, and that Dr. Themistocle had advised Plaintiff "not to drive or operate machinery while on oxycodone." (*Id.*)

The ALJ next reviewed the report of internist Dr. Mescon, the consultant who examined Plaintiff on February 5, 2013. (*Id.* at 26.) The ALJ noted that, on physical examination, Dr. Mescon had found that Plaintiff's ability to do straight leg raises "was limited to 30 [degrees]

in the supine position bilaterally," and that Plaintiff's flexion and extension of his hips had been limited to 95 degrees, but that the remainder of Dr. Mescon's findings were generally normal. (*See id.* (summarizing report).)  The ALJ further noted that, in "Dr. Mescon's opinion . . . [Plaintiff] had no limitations in his abilities to sit, stand, climb, push, pull, or carry heavy objects," but that, because of Plaintiff's history of asthma, "environments with toxic dust, chemicals, or fumes were not recommended."  (*Id.*)

The ALJ then returned to evidence of Plaintiff's treatment at All Med, observing that, on April 26, 2013, Plaintiff had visited Dr. Martin, who determined that Plaintiff suffered from asthma and hypercholesterolemia.  (*Id.*)  The ALJ also noted that Plaintiff had seen internist Dr. Rodriguez on three occasions between August and October of 2013, and had complained, at an appointment on September 26, 2013, of "intermittent chest pain."  (*Id.*)  The ALJ remarked that neither a subsequent chest X-ray, nor X-rays of Plaintiff's thoracic and lumbosacral spine, had shown evidence of any acute pathology.  (*Id.*)  The ALJ noted that, on December 24, 2013, Plaintiff had returned to Dr. Rodriguez, who prescribed Plaintiff Augmentin for a respiratory infection, and that, on January 21, 2014, Plaintiff had been seen by Physician Assistant Mandese, who noted that Plaintiff "had a clear to hard cough with expiratory wheezing," and prescribed Plaintiff Advair and Ventolin for his asthma.  (*Id.*)  The ALJ stated that there was "no documentary evidence of any further medical treatment."  (*Id.*)

After considering this medical evidence, the ALJ then weighed the "opinion evidence" that was before him, which consisted of, first, the report of consultative examiner Dr. Mescon, and, second, a brief statement by pain-management specialist Dr. Themistocle, contained within his treatment notes, that Plaintiff's "ability to drive and operate heavy machinery" was limited "when he was taking oxycodone."  (*Id.* at 27.)  The ALJ gave "great weight" to Dr. Mescon's

opinion, on the ground that Dr. Mescon had "personally examined" Plaintiff and her opinion

was, in the ALJ's view, "well supported by the record." (*Id.*)  The ALJ accorded

Dr. Themistocle's opinion "little weight" because, according to the ALJ, there was "no

evidence" that Plaintiff had been "prescribed oxycodone more than once or that he [had]

continued to take it." (*Id.*)

Finding that, based on the record, Plaintiff had "only intermittently sought and received

treatment for complaints of back pain," the ALJ determined that it would be reasonable to

assume that, if Plaintiff "was experiencing the degree of pain and functional limitation that he

[had] alleged," he would have sought more regular treatment. (*Id.*)  The ALJ also found that

there was "no evidence" that Plaintiff had "ever sought or received treatment for his alleged

hearing loss," and that here, as well, it would be reasonable to assume that, if Plaintiff "had

experienced a significant hearing loss," he would have obtained treatment. (*Id.*)  The ALJ also

stated that the record "show[ed] that [Plaintiff had] never required emergency treatment or

hospitalization for his asthma" and demonstrated that Plaintiff "had no significant side effects

from his medication." (*Id.*)  The ALJ added that Plaintiff had testified that he took one- or

two-block walks, was able to use buses and trains, cooked, did light chores, and attended "some"

of his son's boxing matches, activities which the ALJ found inconsistent "with an inability to

perform any substantial gainful activity." (*Id.*)

## C.    **Steps Four and Five**

At step four of the sequential evaluation, the ALJ found that Plaintiff's "past relevant

work as a bridge painter, an exterminator, and an office clerk" was "light to heavy in exertional

nature," and that, as Plaintiff could only perform sedentary work with certain modifications, as

discussed above, Plaintiff could not perform his past relevant work. (*See id.* at 27.)

At the fifth step, the ALJ considered Plaintiff's ability to perform a limited range of sedentary work, his age of 32, his high-school level of education, and his work experience, and determined, in light of the testimony of vocational expert Vaughn, that Plaintiff would be capable of performing the jobs of lens inserter, check-cashing cashier, and addressing clerk – positions that all existed in significant numbers in the national economy.  (*Id.* at 28.)  Although, at step two, the ALJ had determined that Plaintiff's alleged hearing loss was not a severe impairment, and, in determining Plaintiff's RFC, the ALJ had further found that Plaintiff's testimony regarding his alleged hearing loss was not entirely credible, the ALJ nonetheless noted that, according to Vaughn, Plaintiff "would still be able to perform these jobs even if he could not tolerate more than a moderate level of noise."  (*Id.*)  The ALJ therefore determined that, under the framework of Medical-Vocational Rule 201.28,[42] Plaintiff was "not disabled." (*Id.*)

## III.   **REVIEW OF THE ALJ'S DECISION**

In this action, the parties dispute whether the evidence that was before the ALJ, as augmented by the evidence submitted by Plaintiff to the Appeals Council – and, potentially, by the additional evidence submitted to this Court – is sufficient to support the denial of Plaintiff's application for SSI benefits.  As the ALJ used the applicable five-step evaluation in analyzing

---

[42] Rule 201.28, contained within the Grids, indicates that a claimant is not disabled if the claimant is 18 to 44 years of age, a high school graduate, and skilled or semiskilled, without transferable skills.  In this regard, it should be noted that, earlier in his decision, the ALJ stated that he was not factoring the transferability of Plaintiff's job skills into his decision on disability, as he had determined that the transferability of those skills was "not material to the determination of disability" because use of the Grids "as a framework" for decision-making "support[ed] a finding that [Plaintiff was] 'not disabled,' whether or not [Plaintiff had] transferable job skills." (R. at 27.)  It was not inappropriate for the ALJ to use the Grids as a "framework" for his decision-making, where he also went on to consult a vocational expert regarding jobs that Plaintiff could perform.  *See Cohen v. Commissioner of Social Security*, 643 F. App'x 51, 53 (2d Cir. 2016) (finding it appropriate for ALJ to use the Grids "as a framework for deciding whether there were jobs [a claimant] could perform" where a vocational expert was also consulted).

Plaintiff's claim, the initial question before this Court is whether, in evaluating Plaintiff's claim under this accepted protocol, the ALJ made any errors of law that might have affected the disposition of the case. If the AJL did not commit legal error, then the Court must go on to determine whether the ALJ's determination that Plaintiff was not disabled was supported by substantial evidence.

For the reasons discussed below, this Court finds that the ALJ did make errors of law that might have affected the outcome of this case. Most significantly, the ALJ failed to develop the record, as required, so as to obtain opinions from Plaintiff's treating physicians regarding the extent of his functional impairments. Especially as some additional opinion evidence has now been made part of the Record (through its submission to the Appeals Council), and as that evidence, if considered by the ALJ, might result in a different outcome, I recommend that the matter be remanded for further proceedings.

### A.    The ALJ's Failure to Apply the Treating Physician Rule

In determining the extent of any functional limitations caused by Plaintiff's medical conditions, the ALJ, for the most part, lacked the benefit of any opinion evidence from Plaintiff's treaters. The *only* "opinion" from a treater that could be found in the record at the time of the ALJ's decision was that of pain-management specialist Dr. Themistocle, who briefly noted, within his treatment records, that Plaintiff should not drive or operate machinery while using oxycodone. (*See id*. at 268.) This reference, which presumably related to the side effects of a single medication,[43] was hardly a full-scale opinion regarding Plaintiff's functional abilities or

---

[43] The reported side effects of oxycodone include dizziness and drowsiness. Accordingly, a patient may be advised not to "drive a car, operate machinery, or participate in any other possibly dangerous activities" until the patient "know[s] how this medication affects [him or her]." *See* https://medlineplus.gov/druginfo/meds/a682132.html (last accessed Dec. 22, 2016).

limitations.  Nonetheless, the ALJ treated this notation in Dr. Themistocle's treatment records as "opinion evidence" (*see id*. at 27), and, accordingly, this Court will consider the question of whether the ALJ properly applied the "treating physician rule" in his consideration of that evidence.  On the face of his decision, he did not.

In assigning Dr. Themistocle's "opinion" only "little weight" (*id.*), the ALJ stated, as his sole explanation for this, that "there [was] no evidence that [Plaintiff] was prescribed oxycodone more than once or that he . . . continued to take it" (*id.*).  As an underlying matter, this factual premise was apparently incorrect, as pharmacy records that were included in the record before the ALJ indicate that Plaintiff received at least 16 prescriptions for oxycodone between November 1, 2011 and January 29, 2014, including on four occasions during the relevant period. (*See* R. at 251-52, 256-58.)  In any event, to the extent an ALJ believes that a treating physician's opinion is "insufficiently explained," or "lacking in support," the ALJ is required to "seek clarification and additional information from the physician, as needed, to fill any clear gaps before rejecting the doctor's opinion."  *Rolon*, 994 F. Supp. 2d at 504 (quoting *Correale–Englehart v. Astrue,* 687 F. Supp. 2d 396, 428 (S.D.N.Y. 2010)).  Here, the ALJ does not appear to have sought any additional evidence from Dr. Themistocle regarding the extent to which Plaintiff may have continued to have been prescribed, or to take, oxycodone, following the single prescription that the ALJ noticed in the record.

The ALJ also failed to give explicit consideration to all of the factors listed 20 C.F.R. § 416.927(c) that are relevant to a determination of the amount of weight to be accorded a treater's opinion.  As set out above (*see* Discussion, *supra*, at Section I(C)), when an ALJ decides to give less than "controlling" weight to the opinion of a treating source, the ALJ's consideration of each of those factors "must be transparent, [as] the regulations state that the

44

Commissioner 'will always give good reasons . . . for the weight [it] give[s] . . . [a] treating source's opinion,'" *Hidalgo v. Colvin*, No. 12cv9009 (LTS) (SN), 2014 WL 2884018, at *15 (S.D.N.Y. June 25, 2014) (adopting report and recommendation and quoting 20 C.F.R. § 404.1527(c)(2)[44]); *see also Rolon*, 994 F. Supp. 2d at 507 ("In the Second Circuit, 'to override the opinion of a treating physician . . . the ALJ must *explicitly* consider'" the enumerated factors. (emphasis in original) (quoting *Selian*, 708 F.3d at 418)). Here, the ALJ's decision reflects only that he evaluated the supportability of Dr. Themistocles's opinion, and none of the remaining factors. *See* 20 C.F.R. § 416.927(c)(3).

Finally, even where an ALJ properly determines that the opinion of a treater is not entitled to controlling weight, a treating physician's opinion should generally be entitled to "more weight" than the opinions of non-treating and non-examining sources. *See* 20 C.F.R. § 416.927(c)(1), (2); *see also Gonzalez*, 113 F. Supp. 2d at 589. In this instance, the ALJ not only discounted the opinion of Dr. Themistocle, but, at the same time, gave far greater weight to the opinion offered by Dr. Mescon, a consulting internist, who essentially opined that, with the exception of a need to avoid exposure to toxic dust, chemicals, and fumes due to his history of asthma, Plaintiff had no work-related limitations. (*See* R. at 274.) In according "great weight" to this opinion (*id.* at 27), the ALJ merely stated, as reasons for that determination, that the consultant had personally examined Plaintiff and that her opinion was "well supported by the record." (*Id.*) The conclusory nature of this explanation renders it insufficient to constitute the necessary "good reasons" for weighing the opinion of Dr. Mescon more heavily than that of Dr. Themistocle. *See, e.g.*, *Svay v. Colvin*, No. 15cv6080, 2016 WL 922085, at *4 (W.D.N.Y.

---

[44] Although this regulation applies only to disability insurance claims, a regulation applying to SSI claims contains the same language. *See* 20 C.F.R. § 416.927(c)(2).

Mar. 11, 2016) (ALJ erred in granting "more weight" to a consultant's opinion on the "vague and conclusory finding that it [was] 'well supported by the substantial objective evidence of record'" (citation omitted)).

For all of these reasons, the ALJ did not comply with the requirements of the treating physician rule.  Nonetheless, this Court finds that the ALJ's errors in this regard would not be enough, standing alone, to justify remand.  As Defendant points out in her moving brief, the jobs that were identified by the vocational expert, as jobs that Plaintiff could perform, did not actually require driving or operating machinery.  (*See* Def. Mem., at 17 n.8.)  Thus, even if the ALJ had accorded controlling weight to Dr. Themistocle's opinion on the narrow issue of whether Plaintiff could perform such tasks, the ALJ's ultimate determination on disability would not likely have changed.  Of more significance, as discussed below, was the ALJ's failure to obtain a more thorough opinion from Dr. Themistocle regarding Plaintiff's exertional and other functional limitations, or, for that matter, to obtain *any* opinion testimony on this subject from *any* of Plaintiff's treating sources.

### B.      The Failure To Develop the Record

As stated above (*see* Discussion, *supra*, at Section I(D)), an ALJ has an affirmative duty to develop the administrative record, which generally means that the ALJ must seek to obtain the claimant's "complete medical history," 20 C.F.R. § 416.912(d); *see also Perez*, 77 F.3d at 47 (noting that the ALJ retains this duty "even when the claimant is represented by counsel"). Under SSA regulations, this duty requires the ALJ to request a statement from the plaintiff's treating sources explaining "how [the] plaintiff's impairments affect his or her ability to perform work-related activities."  *Johnson v. Astrue*, 811 F. Supp. 2d 618, 629 (E.D.N.Y. 2011) (citing

20 C.F.R. § 404.1513(b)(6)[45]).  While the absence of such a statement will not necessarily render the medical record incomplete, "the regulations . . . provide that the Commissioner will . . . request such a statement," *id.*; *see also Perez*, 77 F.3d at 47; *Robins v. Astrue*, No. 10cv3281 (FB), 2011 WL 2446371, at *3 (E.D.N.Y. June 15, 2011), and the failure to do has been held to constitute legal error, *Johnson*, 811 F. Supp. 2d at 629-30.  This case illustrates just such a failure.

As of the time of the ALJ's decision in this case, the only medical source statement in the record describing how Plaintiff's impairments affected his capacity to perform employment-related tasks (other than the brief notation Dr. Themistocle made regarding Plaintiff's ability to drive and operate machinery) came from consultative examiner Dr. Mescon.  It appears that, prior to issuing his decision, the ALJ made no attempt to obtain a more complete medical source statement from Dr. Themistocle, who treated Plaintiff's back conditions and associated pain, or any statements from Plaintiff's primary-care physicians at All Med (Drs. Martin and Rodriguez), who, in addition to treating Plaintiff's back conditions, treated Plaintiff's asthma.  To the contrary, it appears that the ALJ placed on *Plaintiff's counsel* the burden of obtaining such opinions, as well as any additional treatment records that may have been necessary to fill in gaps in the medical record that was available at the time of Plaintiff's hearing.  (*See* R. at 36-37 ("grant[ing] [Plaintiff's counsel] 15 days to request additional records").  While Defendant attempts to cast this in a positive light, noting that the ALJ in fact waited more than two months, rather than 15 days, to issue a decision (Def. Mem., at 8 n.5), it was the ALJ's affirmative duty to request treating source opinions, even though Plaintiff was counseled at the time of the hearing.

---

[45] Although this regulation applies only to disability insurance claims, a regulation applying to SSI claims contains the same language.  *See* 20 C.F.R. § 416.913(b)(6).

*See Dickson v. Astrue*, No. 1:06-CV-0511 NAM/GHL, 2008 WL 4287389, at *13 (N.D.N.Y. Sept. 17, 2008) (finding that, where the administrative transcript contained only treatment records and consultative reports, and no "statements from . . . treating sources regarding how plaintiff's impairments affect her ability to perform work-related activities," the ALJ had an affirmative duty to "request that plaintiff's treating physicians assess plaintiff's functional capacity"); *see also Tankisi*, 521 F. App'x at 33 n.1 (noting that the fact that plaintiff was counseled "may explain the absence of a request, [but] it cannot excuse it").

Moreover, this is not a case where medical evidence in the record was so extensive that the ALJ's failure to request treating-source opinions was rendered harmless. The record that was before the ALJ at the time of his decision was not so voluminous or detailed as to remove any doubt regarding the work-related effects of Plaintiff's impairments. Indeed, it appears that the record was incomplete in important respects, including with respect to the absence of treatment notes for numerous visits that Plaintiff apparently made to Dr. Themistocle, and which were reflected only in pharmacy prescription records. That lack of completeness is particularly troubling given that, as noted above, the ALJ discounted the significance of Dr. Themistocle's notation regarding any restrictions to Plaintiff's capabilities caused by the use of oxycodone based on the apparently mistaken belief that Plaintiff had not received that medication on an ongoing basis. Additionally, although the record before the ALJ contained at least certain treatment notes associated with Plaintiff's visits to All Med, many of those notes are illegible. (*See, e.g.*, R. at 282-83, 303, 307, 311, 314, 317.)

The fact that the ALJ made his disability determination without first obtaining treating source statements regarding Plaintiff's functional impairments warrants remand. This is especially so because the opinion evidence from Dr. Themistocle that Plaintiff eventually

48

submitted to the Appeals Council – evidence that should have been obtained by the ALJ – differs in notable ways from the consultative opinion upon which the ALJ relied.

### C.      Failure of the Appeals Council To Consider
         Relevant Evidence Submitted on Appeal_____

"New evidence submitted to the Appeals Council following the ALJ's decision becomes part of the administrative record for judicial review when the Appeals Council denies review of the ALJ's decision." *Perez*, 77 F.3d at 45.  The evidence, however, "must be new and material and . . . must relate to the period on or before the ALJ's decision." *Id.*; 20 C.F.R. § 416.1470(b). Here, two treating-physician questionnaires that Plaintiff submitted to the Appeals Council, as well as a physician letter, are appropriately deemed new, material, and related to the relevant period; thus, that material should be considered part of the administrative record on remand.

The two questionnaires, both completed by Dr. Themistocle (R. at 335-36 (questionnaire dated June 23, 2014), *id.* at 342-48 (questionnaire dated October 10, 2014)), certainly meet the necessary criteria.  The information contained in the questionnaires is new, as it was not previously available to the ALJ.  The information should also be considered material, given that Dr. Themistocle's responses described Plaintiff as having functional limitations that were significantly more restrictive than those identified by consultative examiner Dr. Mescon. (*Compare, e.g.*, R. at 336 (Dr. Themistocle indicating that Plaintiff could sit for three hours during an eight-hour work day), and *id.* at 345 (same), *with id.* at 274 (Dr. Mescon stating that Plaintiff had no limitations in his sitting abilities).)  Further, as Defendant concedes (Def. Mem., at 18), Dr. Themistocle indicated, in the questionnaires, that those limitations applied during the relevant period (*see* R. at 336, 348).

In addition, Dr. Themistocle's letter of October 10, 2014, referring Plaintiff to a neurosurgeon for a possible spinal cord stimulator trial (*see id.* at 341, 345), should also be

deemed both new and material, as it evidences continued, potentially more intensive, treatment of Plaintiff's back pain, and thus might "have influenced the ALJ to evaluate [Plaintiff's] application differently, particularly within the ALJ's assessment of [Plaintiff's] credibility." *Acosta v. Colvin*, No. 14cv4051 (RLE), 2016 WL 6952338, at *17 (S.D.N.Y. Nov. 28, 2016) (finding evidence that plaintiff had received a spinal cord stimulator implant both new and material).  Although post-dating the relevant period, this evidence regarding treatment of Plaintiff's long-standing conditions also "directly relates to [Plaintiff's] condition for the time period for which the benefits were denied."  *Id.* (evidence post-dating ALJ's decision regarding plaintiff's back trauma and associated pain "relate[d] back" where there was "no new injury to [plaintiff's] back or spine").[46]

          As noted above, the Appeals Council denied Plaintiff's request for review on the ground that, in its view, none of the newly proffered evidence provided a basis for changing the ALJ's decision.  (*See* Background, *supra*, at Section C(3); *see also* R. at 1-2, 5.)  In the view of this Court, though, the new evidence described above should be placed before the ALJ, to be appropriately weighed and considered.

          In sum, having failed to develop the record by obtaining evidence from Plaintiff's treaters, the ALJ should, upon remand, be directed to seek such evidence from the doctors who treated Plaintiff during the relevant period at All Med – *i.e.*, Drs. Martin and Rodriguez – and he should also be directed to consider the opinion evidence from Dr. Themistocle that Plaintiff

---

[46] The other two pieces of evidence submitted by Plaintiff to the Appeals Council – medical records, dated August 20, 2014, indicating that Plaintiff had received a transforaminal epidural steroid injection (R. at 338-39), and a second letter from Dr. Themistocle, dated October 10, 2014, apparently referring Plaintiff for physical therapy (*see id.* at 340, 345) – also reflect Plaintiff's continued, post-decision treatment, but, at most, they are consistent with the evidence that was before the ALJ, and therefore cannot be considered both new and material.

50

placed before the Appeals Council, as well as Dr. Themistocle's October 10, 2014 letter. The ALJ should further be directed to weigh all medical opinion evidence in accordance with the dictates of the treating physician rule.

### D.  Evidence Submitted to This Court

Finally, this Court finds that the additional medical records that Plaintiff has submitted to this Court, in conjunction with his opposition to Defendant's motion (*see* Background, *supra*, at Section B(4) (summarizing records); *see also* Pl. Opp. and exhibits thereto) do not materially alter the administrative record, and thus need not be taken into consideration on remand. Much of that additional evidence was either already included in the Record (*compare* R. at 252, *with* Pl. Opp., at 14 (duplicate pharmacy prescription records)), or is cumulative of evidence already in the Record (*see, e.g.*, Pl. Opp., at 15 (April 28, 2016 referral for physical therapy)); thus, this evidence is not "new," as required, *see Tirado*, 842 F.2d at 597. Other evidence that Plaintiff has now submitted bears no apparent relationship to the relevant time period, or does not relate to a medical condition that Plaintiff has claimed to be disabling, and thus does not satisfy the materiality prong of the standard. *See id.* For example, the submitted psychiatric consultation referral form, dated August 8, 2016 (*see* n.7, *supra*), post-dates the relevant period and does not appear to relate back to that period; further, as noted above (*see id.*), Plaintiff has not claimed entitlement to SSI based on any psychiatric condition.

As to any of the submitted evidence that is new and relates to the relevant time period, such evidence, even viewed in the light most favorable to Plaintiff, is – at best – consistent with the evidence already contained in the Record. At worst, the evidence is somewhat detrimental to Plaintiff's claim for benefits (*see, e.g.*, Lincoln Medical emergency room discharge notes, dated June 1, 2016, indicating that Plaintiff was diagnosed with "[m]ild intermittent asthma,

uncomplicated" (Pl. Opp., at 6)), and, therefore, it is not reasonably possible that the inclusion of this evidence from the outset would have resulted in a different outcome of Plaintiff's case. Accordingly, I do not recommend that the ALJ be directed to consider this evidence on remand.

## **CONCLUSION**

For the foregoing reasons, I respectfully recommend that Defendant's motion for judgment on the pleadings (Dkt. 12) be denied, and that Plaintiff's opposition (Dkt. 18) be construed as a cross-motion for judgment on the pleadings in his favor and, as such, be granted, insofar as Plaintiff seeks remand to the SSA for further proceedings. I further recommend that, on remand, the ALJ be instructed:

1. to seek to develop the record by obtaining medical source statements from Drs. Monica Martin and Jose I. Rodriquez, Plaintiff's primary care physicians at All Med Medical and Rehabilitation Center, regarding the extent to which Plaintiff's medical conditions resulted in impairments that, during the relevant period, affected his ability to perform work-related activities;

2. to consider the questionnaires completed by Dr. Themistocle that were submitted by Plaintiff to the Appeals Council, along with the October 10, 2014 neurosurgery referral letter also submitted to the Appeals Council; and

3. to weigh all medical opinion evidence in accordance with the requirements of the treating physician rule.

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report and Recommendation to file written objections. *See also* Fed. R. Civ. P. 6. Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Colleen McMahon, United States Courthouse, 500 Pearl Street, Room 2550, New York, NY 10007, and to the chambers of the undersigned, United States

Courthouse, 500 Pearl Street, Room 1660, New York, NY 10007.  Any requests for an extension

of time for filing objections should be directed to Judge McMahon.  As Plaintiff is proceeding in

this action *pro se*, any submissions he makes to the Court (including any objections to this

Report and Recommendation for filing, any courtesy copies for judges' chambers, and any

requests for extensions of time) should be mailed or otherwise delivered by him to the Court's

*Pro Se* Office.  FAILURE TO OBJECT WITHIN FOURTEEN (14) DAYS WILL RESULT IN

A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.  *See*

*Thomas v. Arn*, 474 U.S. 140, 155 (1985); *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d

1049, 1054 (2d Cir. 1993); *Frank v. Johnson*, 968 F.2d 298, 300 (2d Cir. 1992); *Wesolek v.*

*Canadair Ltd.*, 838 F.2d 55, 58 (2d Cir. 1988); *McCarthy v. Manson*, 714 F.2d 234, 237-38 (2d

Cir. 1983).

Dated:  New York, New York
       January 20, 2017

                                   Respectfully submitted,

                                   DEBRA FREEMAN
                                   United States Magistrate Judge

Copies to:

Hon. Colleen McMahon, U.S.D.J.

Mr. Benito Camacho
521 Tinton Avenue
Bronx, NY 10455

Counsel for Defendant (via ECF)